UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>THOMAS BENNETT | Case No. 22 CR 52<br><br>Hon. Jorge L. Alonso |

### GOVERNMENT'S POST-*SELL* HEARING MEMORANDUM

The UNITED STATES OF AMERICA, through its attorney, MORRIS PASQUAL, Acting United States Attorney for the Northern District of Illinois, respectfully submits this memorandum setting forth findings of fact and conclusions of law based on the *Sell* hearing the Court held on February 15, 2024 (R. 52).

**I.     BACKGROUND**

The defendant is charged by indictment with one count of transmitting a threat in interstate commerce, in violation of 18 U.S.C. § 875(c). (R. 10.) Following receipt of reports from the staff at the Federal Medical Center, Devens, Massachusetts, finding that the defendant was not competent and requesting involuntary medication, the court scheduled a hearing pursuant to *Sell v. United States*, 539 U.S. 166 (2003) on the government's motion. (R. 50.) Prior to the *Sell* hearing, the defendant, by counsel, stipulated to mental incompetency. The sole issue before the Court during the *Sell* hearing then, was whether the defendant should receive involuntary medication in order to restore him to competency to proceed in this case. A *Sell* hearing was held on February 15, 2024. At the close of

the hearing the court ordered the government to file a post-hearing memorandum of law in support of its position. (R. 52.)

## II. FINDINGS OF FACT

The government called one witness during the *Sell* hearing: Dr. Dean Cutillar, a General Adult Psychiatrist at FMC Devens who participated on the defendant's restoration and competency team. Tr. at 18. Dr. Cutillar testified as an expert in the field of adult psychiatry without objection from the defendant.[1] *Id*. at 22. Unless otherwise noted herein, the following findings of fact are based on the testimony of Dr. Cutillar.

Dr. Cutillar is a licensed, board-certified adult psychiatrist has been working with BOP for over 15 years. *Id*. at 16, 19. Before that, he was a psychiatrist with the U.S. Air Force for five years. *Id*. at 17. Dr. Cutillar's role in the defendant's case was to diagnose him and develop a treatment plan. *Id*. As part of the restoration and competency team, prior to the *Sell* hearing in this case, Dr. Cutillar had twice previously testified at *Sell* hearings as an expert in adult psychiatry. *Id.* at 21-22.

During the hearing, the government introduced **GX 2**, which is a Forensic Report authored by Dr. Miriam Kissin, the defendant's treating forensic psychologist (the "Report"). In the report, Dr. Kissin concluded that:

---

[1] During the *Sell* hearing, Dr. Cutillar and defendant Bennett appeared from FMC Devens via videoconference. Defendant Bennett's counsel was present in the courtroom. As reflected in the transcript, during the hearing, at several points defendant Bennett interrupted the proceedings with objections and demands to represent himself *pro se*. References to objections *vel non* in this memorandum are made specifically to those of counsel, and not those of defendant Bennett, who has been represented by counsel during the entirety of these proceedings. *See* Tr. at 56.

> *Mr. Bennett has refused to accept recommended medication treatment on a voluntary basis throughout the instant period of restoration. Without the benefit of psychiatric treatment, Mr. Bennett's delusional perceptions will likely persist and continue to significantly undermine his competency-related capacities. It is anticipated treatment with psychotropic medications would ameliorate Mr. Bennett's psychotic symptoms and improve his competency-related capacities. In the interest of restoring Mr. Bennett to competency, we respectfully request the Court order treatment with psychotropic medication pursuant to* Sell v. U.S. (539 US. 166). *A treatment plan prepared by Mr. Bennett's treating psychiatrist is enclosed, outlining the proposed treatment protocol.*

Report at 20; *see also* Tr. at 24. Appended to the Forensic Report is an "Addendum to Forensic Report: Medication Treatment Plan for Restoration" (the "Treatment Plan") authored by Dr. Cutillar. *Id*. at 24-25. The Court received the Report into evidence without objection.[2] *Id*. at 25. The Treatment Plan was based on a comprehensive set of the defendant's medical and psychiatric records, and Dr. Cutillar's personal evaluations of the defendant. *Id*. at 26. Based on his evaluation, Dr. Cutillar's team diagnosed the defendant with schizophrenia, which Dr. Cutillar described has both "positive" and "negative" symptoms. *Id*. at 27, 31-32. The defendant "is preoccupied with significant delusional thoughts . . . [that] seem to be combinations of grandiose delusions . . . [and] paranoid delusional thoughts. [The defendant] has been preoccupied with stating that the FBI tried to kill him . . . he also probably has pressured speech and racing speech [which] isn't a classic

---

[2] **GX 2** is incorporated herein by reference as it pertains to facts regarding the defendant's mental incompetency and need for antipsychotic medication. *See* **GX 2** at 2-19 (Forensic Report of Dr. Miriam Kissin).

3

symptom of schizophrenia, it is more a symptom of . . . bipolar disorder or bipolar diathesis, which means a tendency toward bipolar disorder." *Id*. at 32, 36-37.

The only treatment option that can significantly decrease the psychotic symptoms of schizophrenia are antipsychotic medications.[3] *Id*. at 38. There are two kinds of antipsychotic medications: first generation and second generation. Older, first generation antipsychotic medications in general have more side effect than newer, second generation antipsychotic medications, but second generation antipsychotics are less effective in treating psychotic symptoms. *Id*. at 38-39. Antipsychotic medications would "most likely decrease [the defendant's] psychotic symptoms and [would] most likely make him competent for or able to participate in the court process." *Id*. at 39. As of the time of the hearing, the defendant had refused to voluntarily undergo treatment with antipsychotic medications, despite being offered such. *Id*.

Because the defendant refused to take medication voluntarily, the alternative treatment plan Dr. Cutillar recommended is a small group of four medications that come in both short-acting and long-acting injections. *Id*. at 40. There are both first generation and second generation medications. *Id*. This "group of antipsychotics [ ] make it less difficult and easier to treat someone involuntarily." *Id*. The medications Dr. Cutillar recommended are Haldol and fluphenazine (Prolixin) (first generation), and Abilify and Zyprexia (second generation). *Id*. Dr. Cutillar also recommended a

---

[3] Dr. Cutillar testified that psychotherapy/group therapy would not be effective in this case. *Id*. at 38.

4

"mood stabilizer [that] may also help to decrease the racing thoughts and pressured speech as well." *Id*. at 41. The defendant's treatment would start with short-acting injections in order to assess potential side effects. In case there are "Parkinsonian side effects or allergic reactions," the medication would only be in the defendant's system for a few hours—a short acting injection. *Id*. at 42. Once the defendant is treated with short-acting injections and—presuming there are no adverse side effects—"a long acting agent will be tried . . . [which] is in the system for two to four weeks." *Id*. at 42-43. This long-acting injection "is an easier way to ensure [ ] adherence to the treatment." *Id*. at 42.

Dr. Cutillar opined that the Treatment Plan was in the medically best interest of the defendant, and would result in a 70-75% chance of decreasing the defendant's psychotic symptoms, based on a reasonable degree of medical certainty. *Id*. at 43. Without medication, the defendant's chance of successful restoration are approximately 0%, given the defendant's refusal to voluntarily take medication. *Id*. at 45. Potential side effects from the treatment regimen are "uncommon . . . transient and temporary" and will not interfere with the defendant's ability to be restored to competency to assist in his own defense. *Id*. at 44-45. Those potential side effects include tremors and rigidity of joints and muscles, weight gain, sedation, constipation, and salivation. *Id*. at 44. Low doses of medication, and administration of other medication, such as anticholinergic medication, can alleviate those side effects. *Id*.

In developing the Treatment Plan for the defendant, Dr. Cutillar and the restoration team "consider[ed] the whole gamut of what's available and what's approved by the FDA in terms of treating psychiatric symptoms" and concluded that "[n]o other treatment or modality is as effective or will decrease psychotic symptoms other than antipsychotic medications." *Id.* at 45. Dr. Cutillar concluded that based on the totality of his training and experience, and his familiarity with the defendant and his present condition, involuntary medication with antipsychotic medications would be medically appropriate in light of the defendant's condition, would have no long-term physical effects on the defendant, and would allow him to participate in the legal process in this case. *Id.* at 47, 53, 55. Dr. Cutillar also described that his team and considered alternative treatment options, such as anti-depression medications and electroconvulsive therapy, but those treatment options "will not decrease psychotic symptoms." *Id.* at 46. Finally, Dr. Cutillar opined that any potential dangers associated with the Treatment Plan are not so significant as to outweigh the defendant's interest in restoration to competency. *Id.*

## III. CONCLUSIONS OF LAW

### A. The *Sell* Factors

The issue before the Court is whether defendant should be involuntarily medicated in an effort to render him competent to stand trial or otherwise resolve this case. In *Sell v. United States*, 539 U.S. 166 (2003), the Supreme Court held that the Constitution permits the government to involuntarily medicate a defendant to restore him or her to competency, provided that four factors are met. First, whether there is an important governmental interest at stake; second, whether involuntary

6

medication will significantly further those interests; third, whether involuntary medication is necessary to further those interests—or whether less intrusive treatments will achieve substantially the same results; and fourth, whether administration of the antipsychotic medication is medically appropriate for the defendant. *Sell*, 539 U.S. at 180-82. To meet this standard, the government must establish each of the four *Sell* factors by clear and convincing evidence. *Id.*

> B. **The Government Has an Important Interest in Restoring the Defendant to Competency to Proceed in this Case Because the Defendant is a Danger to the Community**

> > a. Standard

The first *Sell* factor requires that the Court find that "important governmental interests are at stake." *Id.* at 180. An important governmental interest exists "when the defendant is accused of a serious crime and special circumstances do not undermine the government's interest in trying him for that crime." *United States v. Evans*, 404 F.3d 227, 235 (4th Cir. 2005) (cleaned up). "The Government's interest in bringing to trial an individual accused of a serious crime is important. That is so whether the offense is a serious crime against the person or a serious crime against property. In both instances the Government seeks to protect through application of the criminal law the basic human need for security." *Sell*, 539 U.S. at 180. The court evaluates the seriousness of an offense by looking at its maximum statutory penalty. *United States v. Fieste*, 84 F.4th, 713, 720 (7th Cir. 2023) (citing *United States v. Breedlove*, 756 F.3d 1036, 1041 (7th Cir. 2014).

b.  Facts[4]

The defendant is charged with transmitting a threat in interstate commerce, in violation of 18 U.S.C. § 875(c). As the complaint (R. 1) in this case describes, on January 20, 2022, while located in Montana, the defendant placed a call to the Oak Lawn Police Department Central Dispatch, and made racist and threatening statements about two individuals, Victims A and B—current and former Evergreen Park Police Department ("EPPD") officers. Specifically, the defendant said "Victim A is a n***er, he's a f**k face, he is getting murdered. I'm going to murder him with my bare hands, he's f**ked." During the same call, the defendant said "Victim B's f**ked because apparently one of his nephews was in the naval academy . . . he's f**ked." During the call, the defendant spelled out both Victim A and Victim B's last names for the dispatcher. (R. 1 at 3-4.)

The defendant has an acrimonious history with both Victim A and Victim B stemming from an incident in 2009 in which Victims A and B—at the time both active EPPD Officers, physically subdued the defendant after he resisted arrest. *See* **Exhibit A**, at 3 (filed under seal). During the altercation, the defendant struck both officers, and was subdued with a taser. *Id.*

On the same day that the defendant threatened Victims A and B—January 20, 2022—he also left several voicemails for Individual A, who is an attorney and a former high ranking official with the United States Department of Justice, at

---

[4] The facts described in this subsection are derived from the complaint in this case (R. 1) and from the discovery which has been tendered to defense counsel.

8

Individual A's place of business in Chicago. (R. 1 at 4-5.) During the three voicemails the defendant left in short succession, he called Individual A "f\*\*kface slave [Individual A's last name]" and said that Individual A had committed "war crimes." The defendant left four more voicemails in quick succession for Individual A at his/her place of business on January 24, 2022, apologizing for leaving Individual A "nasty messages."[5] The security branch of Individual A's employer was so alarmed they contacted the FBI and the United States Attorney's Office.

The same day that the defendant threatened Victims A and B, and left voice messages for Individual A (January 20), the defendant also placed a call to Individual B, who, like Individual A, is a prominent attorney in New York City and the child of a former high ranking U.S. government official and federal judge. In that call, the defendant asked Individual B if he [Individual B] would represent the defendant, and said that he was going to "do a 219" and "start shooting people"—which law enforcement interpreted as a threat against 219 South Dearborn Street, the main federal government building in downtown Chicago.

The defendant was arrested on a felony complaint in Billings, Montana on or about January 28, 2022, after court security officers at the federal courthouse in Billings caught the defendant attempting to force entry into the building at approximately 1:40 a.m.

---

[5] During the recording, the defendant's mother can be heard in the background stating "my son has a mental illness, [Individual A], he was not on his medication, that's why he did that, when he's on his medicine, he's a normal human being, but when he doesn't take his medication, he goes off on crazy tangents."

c. <u>Argument</u>

There is no "rigid rule as to what the statutory maximum must be for a crime to be a serious one." *Evans*, 404 F.3d at 238. "Instead, the appropriate consideration is whether any type of crime is serious enough to give rise to an important government interest in light of the individual facts of the case." *Breedlove*, 756 F.3d at 1041. In *Evans*, the Court found that a threat to murder a federal judge—carrying a 10-year maximum penalty—was "'serious' under any reasonable standard." *Id*. And in *Fieste*, the court reasoned that various threats against federal judges, former presidents, and the current president—also carrying a 10-year maximum penalty—were "serious offenses within the meaning of *Sell*." 84 F.4th at 720. *See also Baldwin v. New York*, 399 U.S. 66, 71, 90 (1970) (crimes authorizing punishment for over six months are "serious" for purposes of the Sixth Amendment); *United States v. Valenzuela-Puentes*, 479 F.3d 1220, 1226-27 (10th Cir. 2007) (unlawful reentry is a "serious crime," despite not being violent or harmful to others).

Here, the defendant faces a charge of transmitting a threat in interstate commerce in violation of 18 U.S.C. § 875(c), which carries with it a maximum statutory penalty of 5 years.[6] While the defendant in this case only faces a single-

---

[6] Under Seventh Circuit law, this Court should consider the defendant's maximum statutory penalty when considering the seriousness of the offense. *Fieste*, 84 F.4th at 713.

To the extent that there is an argument that the government's interest is diminished because the defendant has already been confined pretrial for a period in excess of his potential advisory guidelines range, *see* Tr. at 60, the Seventh Circuit stated in *Fieste* that "a defendant's pretrial confinement affects, but does not totally undermine, the strength of the need for prosecution . . . [t]hat principle is even more relevant here, where the

10

count indictment charging threats made against Victim A, the facts in this case make clear that the government has a significant and important interest in protecting "the basic human need for security." *Fieste*, 84 F. 4th at 725. In a span of seven days, the defendant threatened to "murder [Victim A] with my bare hands" and said that Victim B was "f**ked," left no fewer than seven threatening and bizarre voicemails for Individual A, made a call to Individual B that was so startling that Individual B reported it to the FBI, and tried to gain unlawful entry to a federal courthouse in Montana in the middle of the night, only to be stopped by court security officers. This conduct is undoubtedly serious enough to establish the government's important interest in continuing to prosecute the defendant for transmitting a threat. *United States v. Gillenwater*, 749 F.3d 1094, 1101 (9th Cir. 2014) (upholding involuntary medication of a defendant charged with 18 U.S.C. § 875(c) where he was "accused of making lurid and distressing threats against a bevy of government officials and employees"); *United States v. Higgins*, No. 4:19MJ3068, 2020 WL 5899082, at *3 (D. Neb., Sept. 11, 2020) (finding that transmitting a threat under 18 U.S.C. § 875(c) "is a serious crime within the meaning of *Sell*")[7]; *United States v. Garnos*, No. 3:15-CR-30021-RAL, 2017 WL 548215, at *2 (D.S.D. Feb. 10, 2017) (same, collecting cases).

---

government has shown it has a particularly strong prosecutorial interests at stake." *Id.* at 725. For the reasons set forth in this memorandum and during the hearing, namely, the danger to the community if the defendant were released prior to restoration, the government's strong prosecutorial interests mitigate a concern that the defendant is or may be incarcerated pretrial for a period in excess of his advisory guidelines.

[7] Report and recommendation adopted *sub nom*, *United States v. Higgins*, No. 4:19MJ3068, 2020 WL 5893967 (D. Neb. Oct. 5, 2020).

Moreover, the defendant has disturbing history of violence, which almost surely stems from his struggles with mental health. As described in the Pretrial Services report in this case, the defendant was charged in 2016 with attempted murder and aggravated domestic battery in a case in which he allegedly stabbed his mother with a knife, resulting in lacerations and a puncture wound to her head. The defendant then allegedly continued to physically assault his mother by punching and kicking her, then dragging her on the floor, before fleeing the scene. PTSR at 4-5.[8] And **Exhibit A** describes the defendant's prior violent altercation with police, in which the defendant punched two officers and had to be subdued with a taser.

Finally, since he has been confined in BOP, the defendant has continued to exhibit behavior that reflects his dangerousness. Dr. Kissin's Forensic Report details at least three physical altercations the defendant has had with other inmates, and notes that the defendant has "become increasingly aggressive" and has been "behaving in an increasingly hostile and verbally aggressive manner with staff and peers." Report at 10, 12, 14. The report notes that

> *During his time at FMC Devens, Mr. Bennett also reportedly attempted to send threatening letters to various individuals, using legal mail. These were intercepted by his unit team. He also requested to make unmonitored calls to police, family members, special forces in Ireland and various judges, which were all denied. He was granted a telephone call with his defense attorney, which reportedly resulted in Mr. Bennett yelling and his attorney hanging up on him.*

---

[8] The defendant continues to have an active warrant for this matter out of Cook County.

12

*Id*. at 15. At the conclusion of the *Sell* hearing held on February 15, 2024, less than two weeks ago, the defendant directed profane and racist insults at his counsel during the proceedings, further exhibiting the defendant's aggression and lack of improvement during his time at the FMC, during the entirety of which he has refused voluntary medication. Tr. at 65. The defendant's conduct while in BOP confinement is something the Court can, and should, consider when evaluating the first *Sell* factor. *Higgins*, 2020 WL, at *3 ("the 'dangerousness' of the defendant must not be in a general sense or based on an evaluation of nature of the pending charges but must be based on the defendant's behavior <u>while confined</u>.") (collecting cases, emphasis in original).

In sum, based on a totality of the facts and circumstances in this case, including the charged and relevant conduct, the defendant's violent history and characteristics, his refusal to take medication voluntarily, the maximum statutory penalty in this case, and the defendant's increasingly aggressive behavior while in confinement, the government respectfully suggests that it has an important interest at stake in restoring the defendant to competency in order to resolve this case and protect the public, because the defendant has shown that if released unmedicated, he will present a significant danger to the community.

### C. Involuntary Medication Will Significantly Further the Government's Interests

To satisfy the second *Sell* factor, the Court must find by clear and convincing evidence that (1) the proposed Treatment Plan is substantially likely to render the defendant competent, and (2) that the side effects are substantially unlikely to

significantly interfere with the defendant's ability to participate in the proceedings. *Sell*, 539 U.S. at 177; *Fieste*, 84 F.4th at 727.

In this case, Dr. Cutillar testified that involuntarily medicating the defendant with antipsychotic medication will render him competent to participate in the court process, because "his preoccupations with these delusional thoughts will decrease, and so [ ] he will have a clear train of thought . . . Also, his racing thoughts and pressured speech will decrease. And so it will help with his relationship and communication with his legal team." Tr. at 53. Dr. Cutillar opined that there is a 70-75% chance that with medication, the defendant's psychotic symptoms will decrease, and "the likelihood of restoration is good." *Id.* at 43; Report at 22. On the other hand, without medication, Dr. Cutillar believes the defendant's odds of restoration are about 0%. Tr. at 45.

Against that prognosis, Dr. Cutillar testified that potential side effects would be minimal. Such potential side effects include tremors and rigidity of joints, weight gain, sedation, constipation, hypotension, and excessive salivation. *Id.* at 44. These side effects can be alleviated by starting with short-acting injections, and then assessing the defendant; if there are no side effects, the treatment will progress to longer acting injections. *Id.* at 42. Finally, Dr. Cutillar testified that the proposed antipsychotic medications would not interfere with the defendant's ability to regain competency. *Id.* at 45. In sum, Dr. Cutillar's testimony established that the Treatment Plan is likely to help the defendant be restored to competency, and therefore significantly further the government's interests.

14

### D. Less Intrusive Alternatives Do Not Exist

The third element in the *Sell* analysis is whether involuntary medication is necessary to further the government's interests; that is, whether any less-intrusive alternative treatment is likely to achieve the same results. *Sell*, 539 U.S. at 181.

Here, Dr. Cutillar testified that the defendant's restoration team considered "the whole gamut of what's available and what's approved by the FDA in terms of treating psychiatric symptoms." Tr. at 45. The alternative methods of treatment his team considered were psychotherapy, anti-depressants, mood stabilizers, and electroconvulsive therapy, but that those alternative forms of treatment have either "not been shown to effectively decrease psychotic symptoms" or are more geared toward treating depression. *Id*. at 46. His team concluded that "as of the current state-of-the-art, antipsychotic medications is the main treatment for schizophrenia. No other treatment or modality is as effective or will decrease psychotic symptoms other than antipsychotic medications." *Id*. The government has therefore satisfied the third *Sell* factor.

### E. Involuntary Medication is in the Defendant's Best Medical Interests in Light of his Medical Condition

The fourth and final element of the *Sell* analysis is whether the involuntary administration of antipsychotic medication is in the defendant's best interest in light of his medical condition. *Sell*, 539 U.S. at 181. In considering this element, the court must balance the potential side effects of each medication against its potential level of success. *Id*.

Dr. Cutillar testified that his evaluation of the defendant was based on his comprehensive medical records, documentation provided by the FMC medical staff, and documentation provided by the psychology staff. Tr. at 26. Dr. Cutillar also met in-person with the defendant on multiple occasions. *Id*. Dr. Cutillar also estimated that in his career as an adult psychiatrist, he has performed over 100 competency evaluations. *Id*. at 21. Based on his training and experience, his familiarity with the defendant's medical history, and his in-person evaluations of the defendant, Dr. Cutillar opined that the Treatment Plan he authored (*see* Report at 21-23) was in the defendant's best medical interests. *Id*. at 43. He also testified at length about potential side effects, and stated that "these side effects are uncommon, and they can be decreased or minimized or gotten rid of with a low dose medication or anticholinergic medication such as Cogentin. So these other medications that we coprescribe will minimize these side effects." *Id*. at 44; *see also* Report at 22 ("Antipsychotic medications, in general, are safe and free of permanent adverse side effects"). Dr. Cutillar concluded that there are no dangers associated with antipsychotics that are "so significant as to outweigh Mr. Bennett's interest in being restored to competency" and therefore, involuntary administration of antipsychotic medication is "medically appropriate for Mr. Bennett in light of his current medical condition." *Id*. at 47. The government has satisfied the final *Sell* factor.

## IV. PROPOSED ORDER

The Government respectfully suggests that the Court adopt the Treatment Plan authored by Dr. Cutillar, which has been supplemented with the Addendum to that Treatment Plan filed with this memorandum. *See* Report at 21-23 (Treatment

Plan); **Exhibit B** (Addendum to Treatment Plan) (the "Addendum"). Specifically, the Addendum recommends beginning with a one-time trial of short-acting injectable formulation of Haldol Lactate with an initial dose of 5mg, in combination with a dose of 2mg of Ativan, and 50mg of Benadryl in order to decrease anxiety and the chance of Parkinsonian side effects. The Addendum describes that:

> *[I]f there are no significant adverse side effects, then we would transition to giving an injection of long-acting Haldol, called Haldol Decanoate, at a dose of 100mg. Again, we typically combine the long-acting Haldol with Ativan 2mg, and Benadryl 50mg for the same reasons I outlined above.*
>
> *Another injection of Decanoate is given in 2 weeks time. If Mr. Bennett responds well to a dose, then it will remain at that dose every 2 weeks. If he shows no or minimal response, then the dose most likely will be increased but still given every 2 weeks. After about 4 weeks time, we would also draw a blood sample to check the blood levels of the Haldol to make sure that it is within the therapeutic window. This ensures that this treatment is individualized as the blood level of Haldol will take into account several factors that will influence the metabolism of the Haldol in the blood stream. In addition, monitoring of the Haldol blood level will help ensure adherence to the medication treatment.*
>
> *In terms of treatment timeline, significant improvement of Mr. Bennett's psychotic symptoms will appear within 1-2 months of the initiation of the anti psychotic treatment.*

Addendum at 1.

If Haldol does not result in an "adequate treatment response," then the Treatment Plan and Addendum call for trials of Proxilin (Fluphenazine) in a similar

17

manner.[9] That is, "2.5mg for short acting and 12.5mg for long acting Prolixin . . . along with a measurement of a blood level around the 4-week mark." *Id.* at 2.

V.  **CONCLUSION**

For the reasons stated herein, the United States respectfully requests that the Court issue an order allowing for the medical staff at the United States Federal Medical Center in Devens, Massachusetts to involuntarily administer to defendant antipsychotic medication as set forth in the Treatment Plan dated November 4, 2023, and the Addendum to that Treatment Plan dated February 28, 2024 authored by Dr. Dean Cutillar.


Dated: February 29, 2024                    Respectfully submitted,

                                            MORRIS PASQUAL
                                            Acting United States Attorney

                                        By: */s/ Alejandro G. Ortega*
                                            ALEJANDRO G. ORTEGA
                                            Assistant United States Attorney
                                            219 South Dearborn Street
                                            Chicago, Illinois 60604
                                            (312) 353-4129

---

[9] The initial Treatment Plan also recommended Abilify (Aripiprazole) and Zyprexa (Olanzapine) as backup medications. For the reasons described in the Addendum, it appears that these medications are no longer viable medications for use at FMC Devens. Addendum at 2.