IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| United States of America | |
| | Case No. 22 CR 52 |
| v. | |
| | Judge Jorge L. Alonso |
| Thomas Bennett | |

## Memorandum Opinion and Order

The government requests the Court authorize involuntary medication of Defendant Thomas Bennett in an effort to restore him to competency so he may stand trial. Following the parties' presentation of evidence and arguments at a hearing held pursuant to *Sell v. United States*, 539 U.S. 166 (2003), the Court grants the government's request and authorizes involuntary treatment of Bennett as explained below.

## Background

In January 2022, Bennett was charged with transmitting a threat in interstate commerce under 18 U.S.C. § 875(c) after he allegedly threatened to murder "Victim A." (Complaint, ECF No. 1.) According to the criminal complaint, Bennett called a 911 dispatcher in the area covering Evergreen Park, Illinois, used racial slurs against Victim A, a Police Officer in the Evergreen Park Police Department, stated that he was "going to murder [Victim A] with my bare hands," and tried to confirm that Victim A still worked for the Evergreen Park Police Department. (*Id.* at 2–3.) Bennett allegedly had been living in Montana but travelled to the Chicago area after his 911 call. (*Id.* at 3.)

Following his arrest a few days later, and after learning that Bennett previously had been found incompetent to stand trial in the State of Illinois and of his history and behavior, the Court ordered Bennett to undergo a forensic examination to help determine competency. (ECF No. 23.)

After considering the forensic evaluation, the Court found Bennett mentally incompetent and ordered him committed to the Attorney General's custody for hospitalization and treatment in July 2022. (ECF No. 29.) In an October 5, 2023, letter, forensic psychologist Dr. Miriam Kissin reported that Bennett had "remained unwilling to accept psychiatric treatment" and there had been "no discernable change in his underlying delusional thought process." (ECF No. 50 at 2 (quoting forensic evaluation).) In a November 13, 2023, report, Kissin reiterated her finding that Bennett suffers from schizophrenia that rendered him mentally incompetent to stand trial and recommended the Court order involuntary treatment with psychotropic medication under *Sell*. (*Id.* at 3.) The parties stipulated to Bennett's mental incompetency and the government moved for a *Sell* hearing to present evidence to support the involuntary treatment of Bennett via psychotropic medication. (*Id.* at 4.) Bennett's counsel did not object to the government's request. (*Id.*)

The Court granted the government's motion and held a *Sell* hearing on February 15, 2024. (ECF Nos. 51, 52.) At the hearing, the Court heard testimony from a single witness: the government's expert, Dr. Dean Cutillar, who was Bennett's evaluating psychiatrist at the Federal Bureau of Prisons. The government also entered two exhibits into evidence: Cutillar's curriculum vitae, and a November 13, 2023, forensic report (the "Forensic Report") authored by Kissin regarding Bennett's competency restoration. As detailed in the Forensic Report and explained by Cutillar at the *Sell* hearing, Bennett had been evaluated and diagnosed with "Schizophrenia, Continuous." (GX-2, Forensic Report at 15–16.) According to Cutillar and the Forensic Report, Bennett suffers from various delusions, including "beliefs he has been subjected to long-standing persecution from various Chicago-based entities." (*Id.*; *see also Sell* Hearing Tr. ("Tr.") at 27, 32, 36–37, ECF No. 58 (identifying, among other things, Bennett's "grandiose

delusions").) The Forensic Report concluded "that Mr. Bennett's competency related skills are significantly compromised by presently exacerbated symptoms of a serious mental illness or defect, namely Schizophrenia, Continuous, such that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." (GX-2, Forensic Report at 19.) Because Bennett's treatment team expected that "treatment with psychotropic medications would ameliorate Mr. Bennett's psychotic symptoms and improve his competency-related capacities," but Bennett had refused voluntary treatment, the treatment team requested "the Court order treatment with psychotropic medication pursuant to *Sell*." (*Id.*)

Attached to the Forensic Report was an addendum (the "First Forensic Report Addendum") containing a medication treatment plan for the requested involuntary medication of Bennett authored by Cutillar. (*Id.*, Forensic Report Addendum.) This treatment plan explained that antipsychotic medications "will most likely decrease [Bennett's] preoccupation with bizarre and grandiose delusions, and also improve control over his impulsivity" and a "mood stabilizer will help decrease grandiose preoccupation, and decrease episodes of severe depression or severe manic symptoms." (*Id.* at 1.) The treatment plan called for a short-acting injection of Haldol/haloperidol, Prolixin/fluphenazine, Abilify/aripiprazole, or Zyprexa/olanzapine,[1] which are antipsychotic medications, followed by long-acting injections of the same if severe adverse side effects do not arise. (*Id.*) Cutillar found Bennett has a "70-75% chance of improvement of his psychotic symptoms with" that proposed treatment and "the likelihood of restoration is good." (*Id.* at 2.) He also explained the various potential side effects of these medications and

---

[1] Haldol/haloperidol and Prolixin/fluphenazine are "first-generation" antipsychotics; Abilify/aripiprazole and Zyprexa/olanzapine are "second-generation" antipsychotics. According to Cutillar, first-generation antipsychotics tend to have more transient side effects but increased efficacy in decreasing psychotic symptoms. (Tr. at 38–39.)

3

that mood stabilizers can help relieve psychotic symptoms but "are not available in long-acting formulations; therefore, they are very unlikely to be used with anyone who is refusing their prescribed psychotropic medication." (*Id.* at 2–3.)

Following the hearing, the government submitted a post-trial brief and an updated treatment plan (the "Second Forensic Report Addendum") authored by Cutillar that further detailed the proposed treatment plan, including dosages and monitoring periods, and stated that Abilify/aripiprazole and Zyprexa/olanzapine are not available at the facility where Bennett currently is committed. (Second Forensic Report Addendum, ECF No. 54-2.) Cutillar's testimony and the government's exhibits have not been meaningfully disputed.

## Legal Standard

"Individuals have a significant constitutionally protected liberty interest in avoiding the unwanted administration of antipsychotic drugs," and "the forcible injection of medication into a non-consenting person's body represents a substantial interference with that person's liberty." *United States v. Fieste*, 84 F.4th 713, 719 (7th Cir. 2023) (internal quotation marks and citations omitted). Nevertheless, involuntary treatment may be authorized if certain factors are met:

> [T]he Constitution permits the Government involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial, but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests.

*Sell*, 539 U.S. at 179. Therefore, "the government must prove by clear and convincing evidence that: (1) important governmental interests are at stake; (2) involuntary medication will significantly further those interests; (3) involuntary medication is necessary to further those

4

interests; and (4) administration of the drugs is medically appropriate." *Fieste*, 84 F.4th at 719–20.

## Discussion

The Court addresses each of the *Sell* factors below and concludes that the government has met its burden to justify the involuntary medication of Bennett.

1. ***Sell* Factor 1: Important governmental interests**

"First, a court must find that *important* governmental interests are at stake. The Government's interest in bringing to trial an individual accused of a serious crime is important." *Sell*, 539 U.S. at 180 (emphasis in original). The seriousness of an offense is evaluated "by looking to its maximum statutory penalty." *Fieste*, 84 F.4th at 720. Bennett's charge of threatening to murder Victim A carries a five-year statutory maximum. *See* 18 U.S.C. § 875(c). According to the criminal complaint, Bennett allegedly threatened to murder a Chicago-area police officer and soon after travelled from Montana to Chicago. The parties do not dispute that Bennett's alleged threat is a serious crime and the Court does not find otherwise based on comparable cases. *See Fieste*, 84 F.4th at 720 (finding "[n]o one disputes" that threatening to murder judges, foreign presidents, and the current presidents, which carry five-year and ten-year statutory maximums "are serious offenses within the meaning of *Sell*, and we agree").

"Even when a defendant is charged with a serious crime, 'special circumstances may lessen the importance' of the government's interest in prosecuting" and are considered as a "fact-intensive inquiry." *Id.* For example, the government's interest may be affected by "the defendant's lengthy confinement in an institution for the mentally ill, the potential for future confinement if the defendant regains competency, and the amount of time a defendant already has been confined while the charges have been pending." *Id.* The possibility that a defendant will

5

be civilly committed also may diminish the government's interest. *Id.* at 721–22. However, the defendant must "come forward with evidence of mitigating special circumstances" for the Court to consider them—the Court must consider special circumstances that are raised, but need not investigate them *sua sponte*. *Id.* Here, Bennett has not claimed that any special circumstances mitigate the government's important interest in prosecuting him, so the Court does not investigate the issue further. *See id.* at 722–23 (finding defendants have "the duty to bring those facts to light in the first place" and since "here the court had nothing to address" it "committed no error" (citing cases)). The government thus has shown by clear and convincing evidence that it has an important governmental interest in bringing Bennett to trial for his alleged crime.

2. ***Sell* Factor 2: Significance in furthering the interests**

"Second, the court must conclude that involuntary medication will *significantly further* those concomitant state interests." *Sell*, 539 U.S. at 181 (emphasis in original). This requires "that administration of the drugs is substantially likely to render the defendant competent to stand trial" and "is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense." *Id.*

According to Cutillar, the proposed administration of antipsychotic medications as detailed in the proposed treatment plan offers Bennett "a 70–75% chance of improvement of his psychotic symptoms" and "[w]ith the improvement in symptoms, the likelihood of restoration is good." (GX-2, First Forensic Report Addendum at 2.) He explained that the proposed medications "are most effective with cases of grandiose or paranoid delusional ideation," which are Bennett's "most prominent psychotic symptom." (*Id.*; *see also id.*, Forensic Report at 15; Tr. at 32, 36, 37 (explaining that Bennett "is preoccupied with significant delusional thoughts," his schizophrenia is "characterized by several delusional thoughts" which "seem to be combinations

6

of grandiose delusions" and includes "paranoid delusional thoughts," and "his main psychiatric symptoms[] are the delusions and the pressured and racing speech").) At the *Sell* hearing, Cutillar reiterated that treatment with antipsychotic medications "will most likely decrease [Bennett's] psychotic symptoms and will most likely make him competent for or able to participate in the court process." (Tr. at 39; *see also id.* at 54 (agreeing that "forced medication will allow him to participate in the court process and with his counsel").) No contrary evidence or opinion has been presented to the Court. Though this does not guarantee that Bennett will be restored to competency due to the proposed treatment, it does make such a result substantially likely for purposes of the Court's *Sell* analysis. *See Fieste*, 84 F.4th at 727–28 (affirming finding where, among other things, the district court found the defendant had "'at worst' a 73 percent chance of restoration").

Cutillar reports that "[a]ntipsychotic medications, in general, are safe and free of permanent adverse side effects." (GX-2, First Forensic Report Addendum at 2.) Still, he identified several potential side effects that could arise during the proposed treatment plan, particularly since it includes first-generation antipsychotics Haldol/haloperidol and Prolixin/fluphenazine, which typically are more proficient but "have more transient side effects than second generation antipsychotics," which are unavailable at Bennett's facility. (Tr. at 38–39, 44; Second Forensic Report Addendum at 2, ECF No. 54-2.) Antipsychotics like those proposed for Bennett can cause transient, Parkinson's-like tremors or rigidity of joints in rare cases; more common side effects of weight gain, sedation, constipation, excessive salivation, and hypotension; and, most seriously, tardive dyskinesia, which involves irregular muscle movements, is associated with long-term use of antipsychotics in high doses, and can be permanent. (GX-2, First Forensic Report Addendum at 2; Tr. at 54.)

7

To mitigate these potential side effects, the proposed treatment plan calls for first applying short-acting injections, then observing whether any significant adverse side effects arise before transitioning to long-acting injections. (Tr. at 42; Second Forensic Report Addendum at 1–2, ECF No. 54-2.) Cutillar explained that Bennett's treatment team would continue to monitor his condition for side effects, some of which could be decreased or eliminated with other medications. (Tr. at 44.) As for tardive dyskinesia, the proposed treatment plan calls for monitoring a patient for associated side effects every six months and adjusting treatment if they arise, and Cutillar concluded that the condition "is very unlikely to occur during the period [the medication] is being used to restore Mr. Bennett to competency." (GX-2, First Forensic Report Addendum at 2; Tr. at 54–55.)

Ultimately, Cutillar concluded that he did not believe the proposed treatment would interfere with Bennett's ability to regain competency and assist in his legal proceedings. (Tr. at 44–45.) The Court sees no reason to conclude otherwise—the potential side effects described by Cutillar are rare, manageable, or otherwise substantially unlikely to significantly interfere with Bennett's ability to assist his counsel in this case. *See United States v. Breedlove*, 756 F.3d 1036, 1041–42 (7th Cir. 2014) (affirming finding of clear and convincing evidence of this factor where, among other things, the evaluating doctors opined that Breedlove "displayed positive indicators that suggested he would respond positively to the treatment and that any potential side effects of the treatment would be monitored and addressed" and "Breedlove had scant evidence to support his challenge"). The government therefore has met its burden under the second *Sell* factor by clear and convincing evidence.

3. *Sell* **Factor 3: Necessity to further the interests**

"Third, the court must conclude that involuntary medication is *necessary* to further those interests." *Sell*, 539 U.S. at 181 (emphasis in original). This requires "that any alternative, less intrusive treatments are unlikely to achieve substantially the same results." *Id.* Cutillar testified that his psychiatric team considered "the whole gamut of what's available and what's approved by the FDA in terms of treating psychiatric symptoms," including psychotherapy, antidepressants, antianxiety medications, and mood stabilizers, and that "[n]o other treatment or modality is as effective or will decrease psychotic symptoms other than antipsychotic medications." (Tr. at 45–46 (also stating that mood stabilizers "will not decrease psychotic symptoms"); *see also* GX-2, First Forensic Report Addendum at 2–3 (explaining that mood stabilizers "can help relieve psychotic symptoms and bizarre behaviors" but "are not available in long-acting formulations; therefore, they are very unlikely to be used with anyone who is refusing their prescribed psychotropic medication").) Cutillar concluded that "without involuntary medication, Mr. Bennett's chances of restoration are somewhere around zero percent." (Tr. at 45.) Based on this uncontroverted evidence, the Court finds by clear and convincing evidence that to the extent any alternative, less intrusive treatments exist, they are unlikely to achieve substantially the same results as the proposed treatment plan for Bennett. *See Breedlove*, 756 F.3d at 1042 (affirming finding that this factor was met where "[t]he record clearly reflected the opinions of [the experts] that therapy or other non-medication based treatments would be substantially unlikely to restore Breedlove's competency" and "[n]othing in the record contradicts this opinion").

4. *Sell* **Factor 4: Bennett's best medical interest in light of his medical condition**

"Fourth . . . the court must conclude that administration of the drugs is *medically appropriate*, *i.e.*, in the patient's best medical interest in light of his medical condition." *Sell*, 539 U.S. at 181 (emphasis in original). Cutillar explained that based on his medical training, experience, and evaluation of Bennett, Cutillar believed the proposed treatment plan is in Bennett's best medical interest and is medically appropriate in light of Bennett's condition. (Tr. at 46–47.) Bennett's evaluation was based on his medical records, other historical documentation of his condition and behavior, and several in-person meetings. (Tr. at 26.) The Forensic Report details Bennett's schizophrenia diagnosis and related psychiatric history, including a 2002 hospitalization, behavior at the Illinois Department of Human Services Elgin Mental Health Center in 2014, behavior during his detention at the Metropolitan Correctional Center in Chicago in March 2022, and his competency evaluation during his current commitment. (*See* GX-2, Forensic Report at 4–12.) Cutillar's evaluation of and conclusions as to Bennett are unchallenged and sufficiently explain the proposed treatment plan for Bennett and why that treatment plan is appropriate for the purpose of restoring Mr. Bennett to competency given his diagnosed schizophrenia and personal medical history. The Court accordingly finds by clear and convincing evidence that the proposed treatment plan for Bennett is medically appropriate and in his best medical interest in light of his medical condition.

Because the government has met its burden under each of the *Sell* factors, the Court orders the involuntary medication of Bennett as specified in the proposed treatment plan.

## Conclusion

The Court grants the government's request for involuntary medication as to Bennett and authorizes the following involuntary treatment for Bennett at the U.S. Federal Medical Center in

Devens, Massachusetts, as set forth in Cutillar's proposed treatment plan, for two months,[2] or a lesser period if reasonably sufficient to restore Bennett to competency:

- Starting with a single short-acting Haldol Lactate intramuscular injection at a dose of 5mg (potentially in combination with Ativan 2mg and Benadryl 50mg), followed by monitoring Bennett for any emergence of severe adverse side effects that may occur;

- After waiting at least one day from the short-acting injection, and only if there have been no significant adverse side effects from the short-acting injection, Bennett will receive an injection of long-acting Haldol Decanoate at a dose of 100mg (again potentially combined with Ativan 2mg and Benadryl 50mg);

- Unless severe adverse side effects arise, Bennett will receive another Haldol Decanoate injection every two weeks thereafter, with dosage adjustments as medically appropriate;

- After approximately four weeks, a blood sample will be taken from Bennett to check the blood levels of Haldol to ensure it is within the therapeutic window and to help make any medically appropriate adjustments; and

- If Haldol-based treatment is not available, presents severe adverse side effects, does not adequately improve Bennett's psychotic symptoms, or is otherwise not in Bennett's best medical interest, Bennett may instead receive a similar Prolixin/fluphenazine-based treatment in the form of 2.5mg short-acting injections followed by 12.5mg long-acting injections, which similarly shall include monitoring for severe adverse side effects, blood testing after approximately four weeks, and dosage adjustments as medically appropriate.

(See GX-2, First Forensic Report Addendum; Second Forensic Report Addendum, ECF No. 54-2.)

---

[2] The Court may extend this period if appropriate. Neither party proposed an end-date for authorized treatment, but the treatment plan states, "In terms of treatment timeline, significant improvement of Mr Bennett's psychotic symptoms will appear within 1-2 months of the initiation of the antipsychotic treatment." (Second Forensic Report Addendum at 1, ECF No. 54-2.)

The parties shall file a status report regarding Bennett's treatment, including what medications and dosages he has received and is expected to receive, any changes to his treatment, and the status of his restoration to competency, by June 7, 2024.

**SO ORDERED.**                                                                                                    **ENTERED: May 1, 2024**

                                                                                                                                    _____
                                                                                                                                    **HON. JORGE ALONSO**
                                                                                                                                    **United States District Judge**